**THERMA–SCAN, INC., Plaintiff,**

v.

**THERMOSCAN, INC., Defendant.**

**No. CIV.A.98–CV70385.**

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 25, 2000.

---

Mark A. Cantor, George R. Mosher, Jr., Brooks & Kushman, Southfield, MI, for Plaintiff.

Dennis M. Barnes, Barris, Sott, Detroit, MI, Marie V. Driscoll, Fross, Zelnick, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

TARNOW, District Judge.

I. *INTRODUCTION*

..................................................................... 794

II. *BACKGROUND*

..................................................................... 795

    A. *Factual Background* (795)
    B. *Procedural History* (795)

III. *STANDARD OF REVIEW*

..................................................................... 796

IV. *ANALYSIS*

..................................................................... 796

    A. *History of Plaintiff Therma–Scan, Inc.* (796)
    B. *History of Defendant Thermoscan, Inc.* (797)
    C. *Application of the Frisch's Factors* (797)
        1. *Strength of the Mark* (798)
        2. *Relatedness of the Goods* (798)
        3. *Similarity of the Marks* (799)
        4. *Evidence of Actual Confusion* (799)
        5. *Marketing Channels Used* (802)
        6. *Likely Degree of Purchaser Care* (803)
        7. *Intent of Defendant* (803)
        8. *Likelihood of Expansion of the Product Lines* (804)
    D. *Summary Judgment Based on Likelihood of Confusion* (804)

V. *CONCLUSION*

..................................................................... 805

## I. INTRODUCTION

This case is before the Court on remand from the Sixth Circuit Court of Appeals.

---

1. Law Clerk Rita Foley provided quality research assistance.

The Sixth Circuit reversed the previous judgment of this Court enforcing a settlement agreement between the parties. The Sixth Circuit remanded the case, "for a ruling on Thermoscan's motion for summary judgment and, if necessary, for a trial on the merits." *Therma–Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 420 (6th Cir.2000). For the reasons stated herein, this Court GRANTS Defendant Thermoscan's Motion for Summary Judgment.

## II. BACKGROUND

### A. FACTUAL BACKGROUND

The factual background as identified by the Sixth Circuit Court of Appeals, *Therma–Scan, supra* at 415–16, including the identification of Plaintiff Therma–Scan, Inc. as "TSI", will be adopted for purposes of this Memorandum Opinion and Order:

TSI performs infrared thermal imaging examinations at its facility in Huntington Woods, Michigan. From these examinations, it produces diagnostic reports that are used by physicians and patients. On November 1, 1988, TSI properly registered with the United States Patent and *416 Trademark Office its "THERMA–SCAN" trademark, which TSI had been using since 1972.

Thermoscan manufactures hand-held products that determine body temperature by measuring the heat generated within the human ear. On September 24, 1991, Thermoscan registered with the United States Patent and Trademark Office its "THERMOSCAN" trademark, which Thermoscan had been using since 1990. In 1995, Thermoscan was purchased by The Gillette Company, which also owns Braun, Inc. Gillette, in an effort to take advantage of the Braun brand name, began printing "BRAUN" on Thermoscan products manufactured after 1996.

**2.** The Court notes that the settlement agreement was reached after substantial oral argu-

## B. PROCEDURAL HISTORY

TSI filed suit against Thermoscan for trademark infringement, unfair competition, and cancellation of Defendant's registration. TSI sought relief in the form of monetary damages and an injunction. Based on the application of the doctrine of laches, TSI no longer seeks monetary damages in this action, but continues to seek injunctive relief and cancellation of Thermoscan's mark.

Thermoscan moved for summary judgment on October 2, 1998. TSI responded on January 4, 1999. Oral argument was held on February 26, 1999. Counsel for plaintiff referenced some examples of confusion about the marks with regard to a letter received by the plaintiff from a young child, and from the comments of Mr. Hoesktra's peers or coworkers. During oral argument, the parties reached an agreement in settlement of the action. This Court put on the record an outline of the understanding between the parties with regard to settlement.[2]

Defendant Thermoscan, on March 22, 1999, filed a motion to enforce the settlement agreement or, in the alternative, for a ruling on the motion for summary judgment. This Court granted Thermoscan's motion to enforce the settlement agreement on April 20, 1999 and dismissed the action with prejudice.

Plaintiff TSI timely appealed this Court's decision to the Sixth Circuit Court of Appeals. The Court of Appeals, on July 10, 2000, reversed the decision of this Court and remanded the case for a ruling on Thermoscan's motion for summary judgment. The basis of the Sixth Circuit's decision was a finding that the Court had abused its discretion in enforcing the settlement agreement. The Court of Appeals did not consider or reach a decision on the merits of the case. The mandate revers-

ment on the record.

ing and remanding the case was issued on July 31, 2000.

This Court conducted a status conference on August 10, 2000. The parties were allowed to file supplemental briefs in support of their respective positions. Plaintiff TSI filed a supplemental brief in opposition to the defendant's motion for summary judgment on August 31, 2000. Defendant Thermoscan filed a supplemental brief in support of its motion for summary judgment on September 15, 2000. The Court, having considered all evidence previously submitted, as well as the supplemental briefs of the parties, the declarations referred for consideration, and the exhibits attached to the parties' briefs, now issues its ruling on Thermoscan's motion for summary judgment.

## III. STANDARD OF REVIEW

Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law", Fed.R.Civ.P. 56(c). In *Mitchell v. Toledo Hospital*, 964 F.2d 577, 581 (6th Cir.1992), the Court noted that "[t]he principles governing consideration of motions for summary judgment were redefined by the United States Supreme Court in a 1986 trilogy of cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 ... *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 ... and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538."

The Supreme Court held, in *Liberty Lobby, supra* at 2512, that there must be evidence upon which a jury could reasonably find in favor of the plaintiff and that the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient". To defeat the defendant's motion for summary judgment, the plaintiff, "must come forward with more persuasive evidence to support [their] claim than would otherwise be necessary," *Matsushita, supra* at 1356. "Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted," *Celotex, supra* at 2554.

## IV. ANALYSIS

### A. History of Plaintiff Therma–Scan, Inc. ("TSI")

Plaintiff Therma–Scan, Inc. ("TSI") has operated under the name "Therma–Scan" since 1972. TSI's "Therma–Scan" trademark was registered with the Patent and Trademark Office on November 1, 1988. TSI performs diagnostic thermal imaging examinations in Huntington Woods, Michigan. Philip Hoekstra, III is the President of TSI.

TSI provides testing and diagnostic services for patients in various medical fields, ranging from rheumatology, vascular medicine, and screening for breast abnormalities to sports medicine and peripheral neuropathy. Patients are referred, by their own physicians, to TSI for thermographic imaging.

Plaintiff's annual gross sales have ranged from $82,842 in 1991 to $195,197 in 1996. TSI's advertising and promotional expenditures have ranged from a low of $21 in 1991 to a high of $6,410 in 1993. In 1995, TSI spent $364 on marketing expenses.

Plaintiff TSI had constructive notice of the defendant's "Thermoscan" mark in 1991, when it was published by the Patent and Trademark Office. TSI had actual notice of the defendant's usage of "Thermoscan" in October, 1992, when its attorney sent a letter to Mr. Hoesktra, with a copy of a newspaper clipping describing the "Thermoscan" ear thermometers. The president of TSI, Mr. Hoekstra, sent a copy of an advertisement for Thermoscan

ear thermometers to his attorney in December, 1993. Mr. Hoekstra was again advised by his attorney, in June, 1995, to seek cancellation of Defendant Thermoscan's trademark.

The complaint in this case was not filed until January 26, 1998. TSI's complaint states three counts: trademark infringement under 15 U.S.C. § 1114; unfair competition in violation of the Lanham Act § 43(a); and cancellation of the defendant's trademark registration No. 1,658,-639 pursuant to 15 U.S.C. § 1119.

## B. History of Defendant Thermoscan, Inc.

Defendant's predecessor was incorporated under the name "Thermoscan, Inc." in March, 1988. The name has been in continuous usage by the defendant or its predecessor since that time. The defendant began the usage of "Thermoscan" as a trade name in 1988, and as a trademark in 1990. United States Trademark Registration was obtained in 1991, for the mark "Thermoscan" in conjunction with "medical thermometers which measure infrared radiation from a human body surface to determine the temperature of the body."

The defendant claims that it has made widespread use of its Thermoscan name and mark over the past nine years. (Currently, both the "Thermoscan" mark and the product line mark "Braun" appear on the packaging for the ear thermometers, and on the thermometers themselves.) Defendant claimed that its sales of the ear thermometers, in wholesale dollars, increased from 3 million dollars in 1991, to 147 million dollars in 1996.

Defendant also states that it has utilized the Thermoscan mark extensively in marketing and promotion of the thermometers, expending 20 million dollars in advertising in 1996 alone. The defendant advertises and sells its thermometers both to health care professionals and to the general public. Sales to ordinary consumers represent approximately eighty percent of the defendant's ear thermometer sales.

## C. Application of the *Frisch's* Factors

The Sixth Circuit has determined that, "[l]ikelihood of trademark confusion can be a question of law appropriate for determination on a motion for summary judgment." *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 200 F.3d 929, 933 (6th Cir.1999), *cert. granted* —— U.S. ——, 120 S.Ct. 2715, 147 L.Ed.2d 981 (2000). (*Certiorari* was granted in the *Marketing Displays, Inc.* case on the issue of whether "federal trade dress protection protection extends to a product configuration ... covered by an expired utility patent." Brief of Petitioner Traffix Devices, Inc., 2000 WL 1218795 at *i (August 24, 2000).)

■ The Sixth Circuit has adopted the Ninth Circuit's delineation of factors a court should consider when determining whether there is a likelihood of confusion between two trademarks:

1. strength of the plaintiff's mark;

2. relatedness of the goods;

3. similarity of the marks;

4. evidence of actual confusion;

5. marketing channels used;

6. likely degree of purchaser care;

7. defendant's intent in selecting the mark;

8. likelihood of expansion of the product lines.

*Frisch's Restaurants v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982), *cert. denied* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982), *citing AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir.1979) and *Toho Company, Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 790 (9th Cir.1981).

The Sixth Circuit also held that, on a motion for summary judgment, the non-moving party:

must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes

concerning those of the *Frisch's* factors which may be material in the context of the specific case. *Homeowners*, 931 F.2d at 1107. This language does not indicate that any disputed factor is enough, because any one factor standing alone may not be material. Indeed, the district court is apt to find, as it did here, that at least one factor favors the nonmoving party. Since that does not prevent an overall finding of likelihood of confusion in the movant's favor, it would be illogical for a merely disputed factor to preclude summary judgment. *Homeowners* must be understood to mean that the nonmoving party's burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue.

*Marketing Displays, supra* at 934, *quoting Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100 (6th Cir.1991).

The question the Court must now address is whether there is a genuine issue of material fact as to the "likelihood of confusion" such that no reasonably jury could find the defendant liable for trademark infringement or unfair competition. To that end, the Court will discuss each of the *Frisch's* factors as they relate to the facts of this case.

## 1. Strength of the Mark

■ The strength of a trademark, " 'is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due'." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997), *quoting Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir.1985) (*"Frisch II"*). In assessing the strength of a trademark, the court will, "place a trademark into one of four categories: generic, descriptive, suggestive, and fanciful or arbitrary. These categories

constitute a spectrum of increasing strength and are not perfectly discrete." *Daddy's Junky Music Stores, supra* at 280, *citing Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116–17 (6th Cir.1996).

The Therma–Scan and Thermoscan marks may be classified as "descriptive" trademarks. A descriptive trademark, " 'specifically describes a characteristic or ingredient of an article'." *Champions Golf Club, supra* at 1117, *quoting Induct–O–Matic Corporation v. Inductotherm Corporation*, 747 F.2d 358, 362 (6th Cir.1984). Both names reflect the mechanism of action for the respective service or product— "thermo" or "therma" pertaining to heat, plus scanning. TSI's service is to scan human bodies, using thermal imaging technology. Thermoscan sells a product, an ear thermometer, which measures infrared reflection from the tympanic membrane. Thus, both marks describe the product or service and should be considered "descriptive" trademarks, stronger than generic, but weaker than suggestive or arbitrary marks.

## 2. Relatedness of the Goods

■ The Court must determine whether the product offered by Thermoscan and the service offered by TSI are so related as to cause confusion in the minds of consumers. "Services and goods 'are "related" not because they coexist in the same broad industry, but are "related" if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company'." *Daddy's Junky Music Stores, supra* at 282–83, *quoting Homeowners, supra* at 1109.

In this case, one party offers a tangible consumer good, an ear thermometer, widely available for purchase. Thermoscan estimated that, between January, 1997 and July, 2000, it sold approximately 3.2 million ear thermometers. TSI, on the other

hand, offers not a good, but a service. TSI utilizes thermography to provide diagnostic imaging services. TSI and Thermoscan may co-exist in a very broad industry of medical applications of thermology and infrared identification of heat. However, it is unlikely that a consumer wishing to employ the services of TSI for a thermographic diagnostic exam, seeking identification of tumors, diagnosis of circulatory problems, evaluation of thyroid function, or the like, would be so confused by the marks such that they would purchase an ear thermometer manufactured by Thermoscan instead. The goods and services offered by the parties are not so related that consumers would likely be confused and purchase one believing it was the other. Therefore, the "relatedness of goods" in this case favors a finding that there is little likelihood of confusion surrounding the two marks.

### 3. Similarity of the Marks

■ There is no doubt that the marks of the two parties in this case are similar. In fact, only one letter separates the two. The Court notes that TSI's usage includes a hyphen between "Therma" and "Scan" and capitalization of the "S" in "Scan". Thermoscan's usage reflects neither irregular capitalization nor hyphenation. However, the Court also recognizes that the marks must be viewed in their entireties, and not "dissected" into separate elements.

In this case, the inquiry is whether the either of the marks, if viewed alone, would confuse consumers who do not have both trademarks before them, but who may have a vague or general recollection of one of the marks. *Daddy's Junky Music Stores, supra* at 283, *citing Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988) (*Wynn Oil I*). In this case, the degree of similarity between the two marks is evident. "Therma–Scan" and "Thermoscan" are sufficiently similar that, if viewed alone, consumers may not be able to recall which mark is associated with which product or service.

### 4. Evidence of Actual Confusion

■ Evidence of actual confusion about the marks, "is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores, supra* at 284, *citing Wynn Oil I, supra* at 1188. Isolated incidents of actual confusion, "after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likelihood of confusion and may even suggest the opposite." *Daddy's Junky Music Stores, supra* at 284.

Plaintiff TSI's supplemental brief in opposition to Thermoscan's motion for summary judgment purports to present the Court with "new examples of actual confusion caused by Defendant Thermoscan's infringing use of its mark, 'THERMOSCAN'." TSI's own supplemental brief recognizes that, prior to appeal in this case, TSI had previously presented only "minor evidence" of actual confusion to the Court.

Plaintiff TSI's supplemental brief now states that, "recent e-mail messages to Plaintiff Therma–Scan, Inc.'s website at <*info@thermascan.com*> document numerous instances of actual confusion as to the source, affiliation or origin of Defendant Thermoscan's products by both the public and members of the medical community." TSI attached copies of eighteen e-mail messages it received which TSI claims support a finding of actual confusion about the two marks. The content of each of these eighteen e-mail messages has been reviewed by the Court, to determine if there is a genuine issue of material fact as to whether the authors of those messages were confused about the source, affiliation, or origin of the Therma–Scan and Thermoscan marks.

  a. Donna Cooper—asking for coupons or rebates on the one-second ear thermometer. This e-mail is clearly seeking information from Defendant Thermoscan. (10/27/99)

b. Dr. Christian Singer—seeking information about the application of Therma-scan products in human medicine. This e-mail does not seem to indicate that the author has confused the marks; in fact, the e-mail seems more like a request that might be directed to the plaintiff than to Thermoscan (11/29/99)

c. Isamu Takeuchi—a distributor of cardiology, cardiovascular surgery, anesthesiology, critical care, and dermatology products in Japan, stating they "saw information of your products at your Home page." They were inquiring about the possibility of becoming a sales representative of "your products" in Japan. The e-mail does not indicate whether the author is seeking to distribute ear thermometers or thermal imaging equipment and services. While this may evidence confusion about whether TSI provides thermology services or sells thermal imaging equipment, it does not tend to show actual confusion about whether TSI manufactures and sells ear thermometers. (07/15/00)

d. Tony Lee—seeking information and pricing "for your thermal imaging equipment for medical use." This e-mail again demonstrates only confusion about whether TSI sells thermal imaging services or thermal imaging equipment, but does not demonstrate confusion about whether TSI sells ear thermometers. (07/15/00)

e. Roni Leaf—asking about thermography and imaging cameras for use with equine athletes. This e-mail clearly asks for information regarding imaging cameras, not ear thermometers, and is thus more likely intended for TSI than for Thermoscan. Simple confusion about whether TSI does or does not sell the equipment it utilizes in its diagnostic thermal imaging services does not equate to confusion with the Thermoscan ear thermometer trademark. (07/26/00)

f. Dr. Miguel Najera—this e-mail author is planning to build an alternative hospital in Guatemala and is seeking information "about Thermal Image, price, etc." as well as professional advice and continuing education data. Again, this information more clearly relates to the services provided by TSI than to the manufacture and sale of ear thermometers. (07/03/00)

g. Neil Primack—a physical therapist, "exploring the possibility of acquiring Thermography equipment." This e-mail may show confusion about whether TSI sells thermography equipment, but it does not show confusion about whether the physical therapist author was, instead, "seeking to explore the possibility of acquiring" an ear thermometer, which are widely available for retail purchase throughout the United States. (06/23/00)

h. Ms. Li of Zhongsheng Technology Co.—a computer hardware manufacturer "in need of some information about the infrared imaging technology applied in medical and others and hope to become a distributor of your products in China." Here, the reference to "infrared imaging technology" more likely refers to the equipment utilized by TSI than to the ear thermometer sold by Thermoscan. (05/31/00)

i. Tamra Higginbotham—seeking information on who she should contact for repairs on her "thermascan." This e-mail would most clearly refer to the consumer product ear thermometer manufactured by Thermoscan. (02/29/00)

j. Laila L. Ang—importer and distributor of research equipment, requesting information on the "complete line

of infrared thermography with price and catalog." This e-mail does not demonstrate that the author was confused about where to seek information about ear thermometers. The author was, instead, seeking information on "infrared thermography"—a concept more closely associated with the service provided by TSI. (06/11/99)

k.  Jennie Burke—this e-mail requests, "information on your medical infrared imaging equipment." The term "imaging" is a concept more closely related to TSI's services than to the tympanic thermometers sold by Thermoscan. (02/09/99)

l.  Harumi Kimura—this e-mail requests a quote on "Industrial Thermographs for Automobile Industrie and Electronics." This e-mail, seeking information about the use of thermography in the automobile industry, confuses the plaintiff's human medical application of thermography with industrial, automotive uses for thermography, but clearly does not confuse the services of TSI with the ear thermometer sold by Thermoscan. (02/25/99)

m.  Muhsin Coskun—this e-mail purports to be from a "well known firm in medical field in Turkiye." It simply states, "we are interested in your products" and asks for brochures, catalogs, and export price lists. The plaintiff would ask the Court to infer that a medical firm stating an interest in products is evidence of actual confusion between the marks. However, the Court notes that the e-mail could just as easily infer a request for information, similar to many of the e-mails, about thermal imaging equipment. Therefore, this e-mail does not demonstrate that the error in the e-mail request results from the author's confusion between the

Therma–Scan and Thermoscan marks. (03/27/00)

n.  Dr. I. Urlea–Schoen—this e-mail is another request for information about distributing "your products" and asking for a complete catalog and price lists. The e-mail, however, references medical thermology and medical thermography, and would more closely be related to the equipment utilized by TSI than the ear thermometer manufactured by Thermoscan. (05/27/00)

o.  Marnie Phillips—this e-mail evidences confusion, as the author states she is interested in purchasing an ear thermometer. (03/13/99)

p.  Gloria Burgos—this e-mail evidences confusion, as the author seeks to determine whether TSI is the manufacturer of the "Thermoscan" thermometers. (11/20/98)

q.  Richard Haust—this e-mail author asks for information on rebates for ear thermometers, and thus is evidence of confusion of the marks. (12/04/98)

r.  Lori Combs—the author of this e-mail seeks replacement of an ear thermometer as hers "reads 3 degrees above your normal temperature." This e-mail evidences confusion between TSI's imaging services and Thermoscan thermometers. (01/24/99)

The Court is able to determine that only six of the eighteen e-mails submitted by the plaintiff support a conclusion that the authors were confused by the similar marks of TSI and Thermoscan. The e-mails submitted by TSI span a period of twenty months, between November 20, 1998 and July 26, 2000. This Court holds that six instances of confusion over a period exceeding a year and a half is insufficient to raise a genuine issue of material fact as to whether there was "actual confusion" between the marks.

In *Champions Golf Club, supra* at 1120, the Sixth Circuit stated, "four incidents [of actual confusion] is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion." (In *Champions Golf Club,* three of the four incidents of confusion occurred between 1993 and 1994; one incident occurred, "several years before." *Id.* at 1119.) The Sixth Circuit has warned, however, that, the lack of evidence of actual confusion may not be significant. *Daddy's Junky Music Stores, supra* at 284. The factor of "actual confusion" should be afforded great weight only when evidence of past confusion exists or when such evidence would have been available under the circumstances. *Id.* Simply because some e-mail authors are confused as to whether TSI manufactures and sells thermal imaging equipment or solely provides thermal imaging services does not imply that there is actual confusion between the Therma–Scan and Thermoscan trademarks.

## 5. Marketing Channels Used

■ This factor requires that the Court, "consider the similarities or differences between the predominant customers of the parties' respective goods or services ... [f]urther a court must determine whether the marketing approaches employed by each party resemble each other." *Daddy's Junky Music Stores, supra* at 285, *citing Homeowners, supra* at 1110.

The plaintiff's brief in opposition to the motion for summary judgment addresses this factor in only one paragraph, stating that, "[w]hile the parties do not dispute that they use somewhat different marketing channels, there is clear overlap ... both parties are marketing to the same type of end user i.e. health care professionals." Plaintiff's supplemental brief states that the marketing channel utilized by both parties, the Internet, reveals an increase in confusion among customers.

Plaintiff cites a Ninth Circuit case, *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199 (9th Cir.2000), in support of its argument that confusion is likely because both parties market their services via the Internet. "[T]he Web, as a marketing channel, is particularly susceptible to a likelihood of confusion since, as it did in this case, it allows for competing marks to be encountered at the same time, on the same screen." *Id.* at 1207. In the *GoTo.com* case, "the services offered by GoTo and Disney are very similar. Both entities operate search engines and are, therefore, direct competitors on this score." Unlike Disney and GoTo, however, TSI and Thermoscan are not direct competitors, nor are the services offered by TSI substantially similar to the product sold by Thermoscan. Therefore, the *GoTo.com* case is not applicable to this case.

The defendant's brief in support of summary judgment discusses the differences between the predominant customers of both parties, and the marketing channels utilized by both. While the defendant's ear thermometers are marketed to both health care professionals and to the general public, patients avail themselves of TSI's highly specialized medical examination services almost exclusively upon referral from one type of health care professional: a physician. (*See* Hoekstra Deposition at 13, lines 16–19.) Plaintiff TSI largely, although not exclusively, directs its promotional activities to physicians and other health care professionals with the hope that they will refer patients to the plaintiff for thermal imaging diagnostics. (Hoekstra Deposition at 21, lines 20–23.) The Court is persuaded that, because the services offered by TSI are readily distinguished from the product sold by Thermoscan, the fact that both parties utilize the Internet as a marketing channel does not militate in favor of finding a likelihood of confusion between the two. Instead, failure of either party to utilize the Internet for promotion and advertising would seem remarkable, given the increasing

number of consumers who utilize the Web as an information and research tool.

### 6. Likely Degree of Purchaser Care

■ When goods or services are expensive or unusual, "the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion." *Daddy's Junky Music Stores, supra* at 285, *citing Homeowners, supra* at 1111. Plaintiff argues that the e-mails it submitted indicate a likelihood of confusion, "because they come from sophisticated physicians and medical equipment suppliers." Plaintiff admits, in its supplemental brief, that, "[t]he higher the degree of purchaser care, the harder it is to prove likelihood of confusion."

Patients would likely exercise great care in choosing a provider of diagnostic medical services, such as TSI. Physicians who are referring their patients for thermographic scanning are likely to exercise great care in choosing where or to whom they send those patients. Consumers expecting to submit for diagnostic thermographic imaging for rheumatoid arthritis, breast masses, circulatory problems, or thyroid dysfunction would not likely be confused into believing they could or would receive those services by purchasing an ear thermometer. Thus, the high degree of care that purchasers of TSI's services would exhibit favor a finding that confusion is not likely.

### 7. Intent of Defendant

The intent of the defendant in a trademark infringement case, "is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores, supra* at 286, *citing Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir.1987). The Court

notes that the mere prior existence of a trademark does not demonstrate that a defendant has intentionally copied that mark, "otherwise presumably all trademark infringement cases could result in a finding of intentional copying." *Daddy's Junky Music Stores, supra* at 287.

Plaintiff TSI claims that the defendant acted with willful ignorance in failing to determine the availability of Thermoscan as a trademark prior to launching its massive advertising campaigns. Plaintiff argues that the defendant's failure to make efforts toward that end infers the intent of Thermoscan to intentionally copy the mark of Therma–Scan.

Defendant, on the other hand, argues that there is no evidence that Thermoscan had any intent to trade on TSI's good will or to cause confusion in adopting a similar mark. The Court agrees with the defendant; the plaintiff has not offered any evidence from which a jury could reasonably find for TSI on the issue of defendant's intent to purposely copy TSI's trademark. This is especially true given the relatively minor market penetration of Plaintiff's diagnostic services.

Contrariwise, the defendant submitted, as Exhibit 12 of its brief in support of summary judgment, a copy of its application for trademark registration. This November 1, 1989 application contains the declaration of William A. Krahel, President of Thermoscan, Inc., that to the best of his knowledge and belief, "no other person, firm, corporation, or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or to deceive."

Defendant's trademark application, dated February 13, 1990, was initially rejected by the Patent and Trademark Office The rejection stated that the Thermoscan mark was likely to be confused with registered trademark number 657115, "Thermos-

canne." Defendant responded to the rejection and argued that the "Thermoscanne" mark had a distinctive, anglicized spelling, compared to the "Thermoscan" mark. After reconsideration of the defendant's application, the Patent and Trademark Office determined, on January 15, 1991, that the "Thermoscan" mark was entitled to registration.

Defendant's "Thermoscan" mark was published on January 15, 1991 and was issued on September 24, 1991. According to the trademark application materials submitted by the defendant, the Trademark Office did not reject on the basis of, or cause Defendant to be notified of, TSI's "Therma–Scan" mark. Thus, the seventh *Frisch's* factor, intent of the defendant, weighs in favor of finding little likelihood of confusion between the marks.

## 8. Likelihood of Expansion of the Product Lines

"A 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music Stores, supra* at 287, *citing Homeowners, supra* at 1112. Plaintiff TSI states that, "[a]t some point in the future plaintiff may well have wished to get into a smaller scanning or handheld scanner type operation . . ." Plaintiff does not submit any evidence to support a finding that it had definite future plans to expand into a service that might resemble, in size and shape, the current ear thermometers marketed by the defendant. Instead, plaintiff couches its likelihood of expansion in vague terms such as, "at some point" and "may well have wished."

Defendant argues that evidence has not been introduced which might support a claim that the plaintiff intends to expand into the manufacture and/or sale of ear thermometers. The plaintiff does not now sell ear thermometers, nor has it presented any indication that it has plans to do so in the foreseeable future. The plaintiff does not currently sell any tangible devices or products. The defendant does not now offer thermographic diagnostic services, nor has it indicated that it has plans to do so. Therefore, this factor militates in favor of finding a lack of "likelihood of confusion" surrounding the two marks.

## D. Summary Judgment Based on Likelihood of Confusion

■ An analysis of the *Frisch's* factors in this case, suggests that it is not likely that confusion exists about the two marks in this case. A table summarizing the Court's findings, with respect to the *Frisch's* factors may be found on the following page:

| FACTOR | FAVORS |
| --- | --- |
| Strength of the Marks | neither—both are descriptive marks |
| Relatedness of the Goods or Services | Defendant Thermoscan |
| Similarity of the Marks | Plaintiff TSI |
| Evidence of Actual Confusion | Defendant Thermoscan |
| Marketing Channels Used | Defendant Thermoscan |
| Likely Degree of Purchaser Care | Defendant Thermoscan |
| Intent of Defendant in Selecting the Mark | Defendant Thermoscan |
| Likelihood of Expansion of the Product Lines | Defendant Thermoscan |

The evidence presented by TSI does not support its claim that a likelihood of confusion exists as to the source of the ear thermometers or imaging services among a significant number of ordinary buyers. "Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercis-

ing ordinary caution." *Homeowners, supra* at 1111.

The e-mails submitted to the Court by the plaintiff do show that six individuals were confused as to the source of the ear thermometer, over a twenty-month period. However, those six e-mails, unaccompanied by affidavits of the authors as to the basis of the confusion, do not amount to evidence upon which a jury could reasonably find in favor of Plaintiff TSI. *Liberty Lobby, supra* at 2512. "[T]he existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference that no likelihood of confusion exists." *Homeowners, supra* at 1110, *citing Amstar Corporation v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (6th Cir.1980), *cert. denied* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

In contrast, the defendant submitted a supplemental declaration of a supervisor, Lois Workman, who works in Thermoscan's toll-free telephone (1–800–327–7226) customer assistance area. Ms. Workman's declaration states that in her four years as a customer service supervisor, she does not recall having ever received a call from someone inquiring about thermographic diagnostic scanning.

Additionally, the defendant submitted the printout of the non-Gillette product inquiries received at their toll-free number between April 1, 1999 and August 16, 2000. The Court reviewed that printout and did not find any references to "thermographic imaging," or the type of services provided by the plaintiff, on the non-Gillette product inquiry log.

The defendant states that approximately 11,000 calls are received from consumers each month. Considering approximately 176,000 customer calls (11,000 phone calls each month over a sixteen month period), the Court finds it significant that no references to phone calls inquiring about the plaintiff's services were received. To defeat Defendant Thermoscan's motion for summary judgment, Plaintiff TSI, "must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary," *Matsushita, supra* at 1356. The six Thermoscan-related e-mails submitted by the plaintiff are insufficient to establish a genuine issue of material fact about the likelihood of confusion regarding the Therma–Scan and Thermoscan marks. Therefore, summary judgment in favor of the defendant is appropriate in this case.

The Court will grant the defendant's motion for summary judgment, based on its finding that no genuine issues of material fact exist as to the likelihood of confusion of the trademarks. Therefore, having decided that the plaintiff cannot prevail on the merits of its trademark infringement and Lanham Act claims, the Court need not address the defendant's arguments that TSI is barred from seeking injunctive relief under the doctrine of equitable estoppel.[3]

## V. CONCLUSION

Plaintiff TSI has failed to establish the existence of genuine issues of material fact with regard to its claims of trademark infringement under 15 U.S.C. § 1114 or unfair competition under § 43(a) of the Lanham Act. The Court, having analyzed and weighed the factors presented in *Frisch's, supra,* finds that TSI has failed to come forward with sufficient evidence to support its claim, upon which a reasonable jury could find in its favor. *Liberty Lobby, supra; Matsushita, supra.* Therefore, Defendant Thermoscan's Motion for Sum-

---

**3.** However, the Court notes that, having been notified by its own attorney on October 20, 1992 of Defendants' use of "Thermoscan" in conjunction with the sale of an ear thermometer, Plaintiff waited until January 26, 1998 to file the Complaint in this case. The Court finds it curious that Plaintiff waited longer than five years to bring its trademark infringement and unfair competition claims.

mary Judgment IS HEREBY GRANTED. Judgment shall be entered accordingly.