**Donna–Margaret GOSCICKI d/b/a German Silver Sink Co.,
Plaintiff,**

v.

**CUSTOM BRASS & COPPER SPECIALITIES, INC., a Michigan for profit corporation, and Matthew P. Ridky, jointly and severally, Defendants.**

No. 01–71452.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 2002.

Michael S. Cafferty, Michael S. Cafferty
& Assoc., Detroit, MI, for plaintiff.

David H. Aldrich, Michael G. Harrison,
Foster, Swift, Lansing, MI, for defendants.

### *MEMORANDUM OPINION*
### *AND ORDER*

HOOD, District Judge.

## I. FACTS

In 1993, Don Hill, doing business as Don Hill, Inc., contracted with Plaintiff's predecessor in interest, Custom Craft, to fabricate a sink thought to have originated decades earlier in Germany. The sink had not been produced in this country for several decades. After building the replica of the sink, Custom Craft began marketing and selling the sinks, which were made of a metal alloy called "German Silver" and featured a stylized "S"-shaped divider between the two sink bowls.

Defendant Matthew Ridky, as an employee of Don Hill, Inc., did the original drawings and templates for the reproduction. Later, Ridky purchased Don Hill, Inc., and changed the name of the company to Custom Brass & Copper Specialities, Inc. Beginning in 1995, Defendants began using the templates they created for Plaintiff's predecessor to fabricate their own version of the sinks.

In 1997, Plaintiff purchased the interests of the owner of Custom Craft and has been operating the company as a sole proprietorship using the d/b/a "German Silver Sink Company." Upon purchasing Custom Craft, Plaintiff immediately attempted to register the German silver sink as a trademark with the United States Patent and Trademark Office ("PTO"). This initial attempt was abandoned in favor of registering the "S"-shaped divider. Plaintiff claims that the registration of the mark was not intended to serve as a company logo, but for a "stylized S-shaped divider used in the sinks sold by the Plaintiff." Pl.'s Answer to Defendants' Motion for Summary Judgment (sic) at 3.

While Plaintiff was in the process of obtaining the trademark, Defendants became aware of her attempt to do so. Although Defendants had been producing the sinks using the design which Plaintiff was attempting to register as a trademark, the Defendants did not attempt to intervene in the registration process. Instead, the parties began corresponding vigorously regarding Plaintiff's attempt to register the mark, with Defendants expressing their objections. The PTO granted Plaintiff's request to register the "S"-shaped divider in June of 1997. Despite this knowledge, Defendants continued using the design in their version of the German sink.

Plaintiff claims that "[t]he Defendant has written numerous misleading correspondence and advertisements wherein he has informed the public and customers and distributors of the Plaintiff that the Plaintiff's trademark only covers a 'company logo.'" Pl.'s Br. at 4. Plaintiff further argues that "[t]he Defendant even went so far as to contact the distributor of the Plaintiffs, Elegant Additions, in writing and advised them that he was going to

ultimately put the Plaintiff out of business and 'take her mark.' " *Id.*

On April 13, 2001, Plaintiff Donna–Margaret Goscicki, d/b/a German Silver Sink Company ("Plaintiff"), filed a three-count Complaint against Defendants Custom Brass & Copper Specialties, Inc. and Matthew Ridky (collectively "Custom Brass" or "Defendants"). The Complaint against Defendants assert claims of trademark infringement, unfair competition, and breach of fiduciary duties. Defendants have moved for summary judgment as to all claims. For the following reasons, Defendants' motion should be granted in part and denied and part.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Failure of a movant to support the motion by affidavits is not fatal if whatever is before the court demonstrates that the standard for the entry of summary judgment as set forth in Rule 56(c) is satisfied. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Chambers v. United States,* 357 F.2d 224 (8th Cir.1966).

In determining whether there are issues of fact requiring a trial "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). A "material"

fact exists if there is a "dispute over facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must look to the substantive law to identify which facts are material. *Id.* at 248, 106 S.Ct. 2505. An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

The moving party has the initial burden of showing there is no genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party need not support the motion by affidavits. *Id.* Summary judgment must be entered if the nonmoving party fails to provide sufficient evidence on an essential element to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. The nonmoving party must present more than a mere scintilla of evidence and "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 252, 106 S.Ct. 2505 (internal citation omitted). If the nonmoving party fails to present evidence that opposes the moving party, the evidence submitted by the moving party will be taken as true. *Id.* at 248–49, 106 S.Ct. 2505.

## III. ANALYSIS

**A. Timeliness of Plaintiff's Answer to Defendants' Motion for Summary Judgment (sic) and Defendants' Reply**

Defendants served their Motion for Summary Judgment and Brief in Support by mail on October 19, 2001. The Local Rules for the Eastern District of Michigan state that "a Response to a dispositive motion must be filed within 21 days after

service of the motion." E.D. Mich. L.R. 7.1(d)(1)(B). Allowing three extra days in accordance with Federal Rule of Civil Procedure 6(e), Plaintiff had until November 13, 2001 to file her Response. Plaintiff's "Answer to Defendants' Motion for Summary Judgment," however, was not filed until November 20, 2001. Defendants request that this court strike Plaintiff's "Answer" as untimely.

Local Rule 7.1(d)(1)(C) requires a Reply to be filed within 7 days after service of process of a Response. Plaintiff's proof of service was dated November 20, 2001. Because of intervening weekends and the Thanksgiving holiday, Defendants had until December 3, 2001 to file their Reply. Their Reply was filed December 5, 2001. Defendants claim that Plaintiff's "Answer" was not received in their office until November 27, 2001, seven days after the date noted on the proof of service. Defendants have attached an affidavit to this effect to their Reply. Arguing that the delayed delivery of Plaintiff's Response resulted in their tardy Reply, Defendants request that this Court excuse their apparent violation of Local Rule 7.1(d)(1)(C) and accept their Reply.

Local Rule 11.1 gives this Court the discretion to impose an appropriate sanction upon the attorneys, law firms, or parties that have knowingly violated the Local Rules or are responsible for the violation. As both filings are helpful and not extraordinarily untimely, this Court declines to exercise its discretion to strike Plaintiff's tardy Response, but rather exercises its discretion by granting Defendants' request to accept its Reply despite the violation of Local Rule 7.1(d)(1)(C).

## B. Federal Claims

Count I of Plaintiff's Complaint alleges trademark infringement in violation of the Lanham Act. 15 U.S.C. § 1051 *et seq.* Count II alleges unfair competition under the same.

### 1. Trademark Infringement under the Lanham Act

Plaintiff contends that Defendants have infringed upon her mark, which "consists of a stylized design of a divider used to divide a sink into separate compartments," *see* U.S. Trademark No. 2281023 (registered Sept. 28, 1999), in violation of the Lanham Act. As Defendants have observed, Plaintiff alleges without specificity which section of the Act has been violated, thereby leaving the Defendants and the Court to ascertain the appropriate analysis to undertake.

Both parties agree that this case involves "trade dress," which refers to "the image and overall appearance of a product." *Esercizio v. Roberts,* 944 F.2d 1235, 1238–39 (6th Cir.1991). As described by the Sixth Circuit, trade dress "embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale." *Id.* at 1239. Trade dress can be protected both under §§ 32 and 43 of the Lanham Act. *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 868 (8th Cir.1994). The former protects trade dress only if it is registered on the Principal Register of the Patent and Trademark Office ("PTO"), *see U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir.1997), while the latter protects unregistered trade dress. *Esercizio,* 944 F.2d at 1238–39.

In order to establish a case of trademark infringement under § 32, a plaintiff must be able to show: (1) the mark is valid and owned by the plaintiff; (2) that the defendant is using the same or similar mark; and (3) the use of the mark

by the defendant is likely to cause confusion.[1] *Pita Delight, Inc. v. Salami*, 24 F.Supp.2d 795, 799 (E.D.Mich.1998). To prevail on a trade dress infringement claim under § 43, a plaintiff must demonstrate that the allegedly infringing feature is not "functional" and is likely to cause confusion with the product for which protection is sought. *See* § 43 of the Lanham Act, 15 U.S.C. § 1125. In both cases, a producer must show that its trade dress is distinctive. *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

Defendants have not argued that they have not violated § 32 of the Lanham Act in their Brief in Support of Motion for Summary Judgment. Instead, Defendants expressly construe Plaintiff's Complaint as one alleging a violation of § 43 and argue their motion accordingly. *See* Defs.' Br. at 2, 5. In this regard, Defendants rely primarily on the "functionality" doctrine of trademark law to argue that Plaintiff's claim fails.

### a. The Functionality Doctrine

■ "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). Generally, a product's feature is considered "functional" if it is essential to the use or purpose of the article. *Id.* at 165, 115 S.Ct. 1300. A feature is functional if it "affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.*

The parties disagree as to who has the burden of showing whether the design is functional or non-functional. Defendants cite § 43 of the Lanham Act and *Wal–Mart*, 529 U.S. at 209, 120 S.Ct. 1339, for the broad proposition that the Act now requires a Plaintiff to demonstrate that the infringing feature is not functional. Defendants argue Plaintiff's Complaint is inadequate on its face because she has failed to do so. Defs.' Br. at 5. Plaintiff responds by arguing that functionality is an affirmative defense for which the Defendants bear the burden of proof. Pl.'s Br. at 6. As discussed below, Defendants' contention is not entirely accurate.

While Defendants correctly note § 43(a)(3)'s declaration that "the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional," the plain language of § 43(a)(3) limits its applicability to civil actions "for trade dress infringement ... for trade dress *not registered* on the principal register." 15 U.S.C. § 1125(a)(3). Trade dress registered with

---

**1.** Section 32 of the Lanham Act states in pertinent part that

(1) Any person who shall, without the consent of the registrant

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisement intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114

the PTO under § 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), however, enjoys the protection of § 32 of the Lanham Act, which delineates the remedies for infringement of registered trademarks. *See* 15 U.S.C. § 1114; *see also Wal–Mart,* 529 U.S. at 209, 120 S.Ct. 1339 ("Registration of a mark under § 2 of the Lanham Act ... enables the owner to sue an infringer under § 32.").

■ In the case at bar, Plaintiff's mark is registered under § 2(f). Registration with the PTO entitles Plaintiff to the presumption that her mark is valid. *Wal–Mart,* 529 U.S. at 209, 120 S.Ct. 1339. Consequently, "[r]egistered marks ... are presumed to be distinctive and nonfunctional." *See Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.,* 470 F.2d 975, 977 (6th Cir.1972) (stating that where there is a question of non-functionality, "registration with the Office of Patents gives rise to a rebuttal presumption that the trademark is valid" and therefore nonfunctional); *see also Aromatique,* 28 F.3d at 869; *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1190 (6th Cir.1988). Section 43(a)(3), therefore, is not determinative. Rather, § 32 governs this case. This Court concludes, that Defendants have the burden of rebutting the presumption of non-functionality of Plaintiff's mark.

Defendants first argue that Plaintiff obtained the trademark in an attempt to skirt the Supreme Court's prohibition against functional features vesting perpetually in the producer. In *Qualitex,* the Supreme Court stated that granting a trademark to a functional feature would inhibit legitimate competition by allowing a producer to control a useful product feature, which is the province of patent law. *See Qualitex,* 514 U.S. at 169, 115 S.Ct. 1300. Defendants contend that because Plaintiff could not have obtained a patent of any kind when she applied for the trademark she attempted to circumvent the pat-

ent registration requirements and substitute a trademark in precisely the fashion which concerned the Supreme Court in *Qualitex.*

While this latter allegation may be true, the issue before the Court is whether Defendants infringed Plaintiff's validly obtained trademark by utilizing the "S"-shaped divider in their sink. More relevant to this determination is Defendants' assertion that "the sink was designed for a special purpose, namely washing dishes and crystal and is functional in several ways, including drain placement and configuration," Defs.' Br. at 2, and Defendants' contention that the "S"-shaped design is operationally functional because the divider is "a critical functional aspect of the sink and [therefore] not subject to trademark infringement." Defs.' Br. at 5. To support these claims, Defendants point to a Swiss patent for a sink created by Walter Franks and entered on January 31, 1951.

### i. Operational Functionality

■ According to Defendants, the Custom Brass sink at issue in this case is a "claimed embodiment" of Franke's sink. *Id.* at 7. The Franke patent describes a sink containing a drain extending above it's base. As detailed in Defendants' brief:

> In the Franke patent, the raised drain is situated in a "protrusion" beyond the usable space of the sink. This protrusion is a functional improvement of this type of drain in several aspects. Prior are sinks attached a "niche body" that was soldered to the edge of the sink. A hole was cut into the sink to represent a raised drain from the useable space of the sink. After a relatively short time, though, the niche body solder connection would no longer be watertight and reliable repair was impossible. Other prior art demonstrated difficulty accessing and inspecting raised drains. Further,

all prior art were difficult, expensive and time consuming to manufacture.

The Franke patent's illustrated protrusion is integrated into one wall of the sink and represents several functional improvements over the prior art as follows:

1. Potential breaking of washed items is reduced since the raised drain is beyond the usable space of this sink;

2. Leakage is reduced since no hole needs to be cut into the sink;

3. The drainage area is easily accessed, cleaned, and inspected;

4. The protrusion shape allows easier and less costly manufacturing costs since no other devices need to be manufactured or soldered to the side. The protrusion can be manufactured with the rest of the sink since it "opens toward the sink across its complete cross-section and laterally on its complete height." *Franks* at 3.

Defs.' Br. at 7. Defendants claim that the functional goal of the Franke sink was to make it easy to manufacture. In Defendants' estimation, "clearly," the easiest way to manufacture the invention in double sink configuration would be the "S"-shaped divider. *Id.*

This court disagrees with Defendants' characterization of its sink as "clearly" the easiest way to produce the Franke sink, as it is not at all apparent that this is so. Plaintiff's contention that "[a]n 'S'-shaped divider is not necessary for the placement of the drain as shown by the Franke design, which does not include an 'S'-shape divider" has merit. *See* Pl.'s Br. at 7.

Defendants have not demonstrated the operational functionality of the "S"-shaped divider. However, they have demonstrated the existence of a triable issue of material fact as to this issue.[2]

### ii. Aesthetic Functionality

■ Although Defendants have failed to show that the placement of the "S"-shaped divider is operationally functional, this court concludes that they have succeeded in showing that the divider is aesthetically functional because Plaintiff has not attempted to rebut Defendants' claim in this regard. Moreover, the law of aesthetic functionality strongly supports granting Defendants' Motion for Summary Judgment.

The RESTATEMENT (THIRD) OF UNFAIR COMPETITION describes the concept of aesthetic functionality as follows:

When aesthetic considerations play an important role in the purchasing decisions of prospective consumers, a design feature that substantially contributes to the aesthetic appeal of a product may qualify as "functional." As with utilitarian design features, however, the fact that the design performs a function by contributing to the aesthetic value of the product does not in itself render the design ineligible for protection as a trademark. A manufacturer thus does not forfeit trademark rights simply because prospective purchasers find the design aesthetically pleasing. A design is functional because of its aesthetic value only if it confers a significant benefit that cannot practically be duplicated by the use of alternative designs. Because of the difficulties inherent in evaluating

2. *Wal–Mart* is not to the contrary, as it involved an unregistered trade dress design. *See, Wal–Mart,* 529 U.S. at 208, 120 S.Ct. 1339 (noting that the plaintiff brought its action for *inter alia,* infringement of unregistered trade dress under § 43(a) of the Lan-

ham Act). The Court's recognition that "[t]he text of § 43(a) provides little guidance as to the circumstances under which *unregistered* trade dress may be protected," demonstrates that its focus was on unregistered trade dress. *Id.* at 210, 120 S.Ct. 1339 (emphasis added).

the aesthetic superiority of a particular design, a finding of aesthetic functionality ordinarily will be made only when objective evidence indicates a lack of adequate alternative designs. Such evidence typically is available only when the range of alternative designs is limited either by the nature of the design feature or by the basis of its aesthetic appeal. The ultimate test of aesthetic functionality, as with utilitarian functionality, is whether the recognition of trademark rights would significantly hinder competition.

*Id.* at §§ 17, Comment c, pp. 175–176 (1993); *see also Qualitex*, 514 U.S. at 170, 115 S.Ct. 1300 (referring to the RESTATEMENT (THIRD) OF UNFAIR COMPETITION in its discussion of aesthetic functionality).

Plaintiff's primary claim is that Defendants have infringed upon her mark, which is described as a "stylized design of a divider used to divide a sink into separate compartments." *See* Complaint at ¶ 22 (citing Exhibit C). Defendants cite numerous cases supporting their claim that the "S"-shaped divider is aesthetically functional. *Meadowcraft, Inc. v. B.I. Industries, Inc.*, 226 U.S.P.Q. 244 (N.D.Ala. 1985); *Deere & Co. v. Farmhand, Inc.*, 560 F.Supp. 85 (S.D.Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir.1983); *Keene Corp. v. Paraflex Industries, Inc.* 653 F.2d 822 (3rd cir.1981); *Damn I'm Good, Inc. v. Sakowitz, Inc.* 514 F.Supp. 1357, 1360 (S.D.N.Y. 1981); *Famolare, Inc. v. Melville Corp.*, 472 F.Supp. 738 (D.Hawaii 1979). Defendants also refer to Plaintiff's own deposi-

tion testimony to buttress their claim of aesthetic functionality. In her deposition, Plaintiff admits that the style of the divider has an aesthetic appeal when she states the style of the divider is what gives rise to her suit. (Pl. Dep. Tr., p. 49, lines 9–25).[3]

The Restatement declares that "a manufacturer does not forfeit trademark rights simply because prospective purchasers find the design aesthetically pleasing." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17. Here, Defendants contend that they have imitated Plaintiff's trademark because Defendant Ridky "did the original drawings and templates for the reproduction" and "retained the drawings and templates as his property as a result of ownership of Don Hill." Defs.' Br. at 1. Even assuming the truthfulness of this argument, ownership of the drawings and templates are not the issue before this court. Rather, as expressed earlier, the issue is whether Defendants have infringed upon Plaintiff's validly obtained trademark for her sink divider.[4] In this regard, Defendants have not shown that their imitation of Plaintiff's "S"-shaped divider was for any other reason than the design being "aesthetically pleasing."

Defendants' citations to various cases concerning aesthetic functionality do not unequivocally demonstrate the appropriateness of granting summary judgment in favor of Defendants as to this issue. In *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822 (3d Cir.1981), for example, the

---

3. Q. If another company decided to make a similar sink in terms of appearance, but out of a different material, do you think that they would be infringing?
A. Yes.
Q. So, it's not the material that you feel is unique. It's the style of the divider.
A. Yes.
 \* \* \* \* \* \*
A. . . . It's just the style of the divider.

4. Defendants also claim that Plaintiff's own deposition testimony supports its position regarding the operational functionality of the "S"-shaped divider. However, a review of the testimony reveals no such support. Plaintiff's testimony is equivocal.

court held that architectural compatibility was a proper consideration of functionality. As Defendants have not argued that the "S"-shaped design is architecturally *required,* but a consideration, this is not an issue here. As the *Keene Corp.* court itself recognized:

> The facts in this case present a unique situation. The luminaire itself is essentially a utilitarian product, used to light exterior area. However, because it is a wall-mounted luminaire, as distinguished from a freestanding street lamp, part of its function includes its architectural compatibility with the structure or building on which it is mounted. *Thus its design configuration, rather than serving merely as an arbitrary expression of aesthetics, is intricately related to its function.*

*Id.* at 826. (Emphasis added). Though Defendants have attempted to argue that the "S"-shaped design is "intricately related to its function," they have failed in this attempt. To the contrary, this case seems to present a fact question as to whether the divider serves "merely as an arbitrary expression of aesthetics." Nonetheless, because the recognition of Plaintiff's trademark rights would significantly hinder competition, this Court concludes that the "S"-shaped design is aesthetically functional.

Illustration 8 of the RESTATEMENT (THIRD) UNFAIR COMPETITION § 17 demonstrates why Defendants' contention of aesthetic functionality is persuasive. Illustration 8 states:

> A is the first seller to market candy intended for Valentine's Day in heart-shaped boxes. Evidence establishes that the shape of the box is an important factor in the appeal of the product to a significant number of consumers. Because there are not alternative designs capable of satisfying the aesthetic desires of these prospective purchasers, the design of the box is functional under the rule stated in this Section.

Similarly, objective evidence indicates that there is a lack of adequate alternatives to Plaintiff's "S"-shaped design. Both the design feature of Plaintiff's mark and the basis of its aesthetic appeal limit the range of alternative designs available to its competitors. Like the heart shaped box, there are not too many ways in which to design an "S"-shaped divider.

While a manufacturer does not forfeit trademark rights simply because prospective purchasers find the design aesthetically pleasing, where, as here, the objective nature of the design limits the alternatives available to competitors, a court could deem the trademark forfeited. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17. This Court concludes that Plaintiff's design is aesthetically functional because it confers a significant benefit that cannot practically be duplicated by the use of alternative designs. For the following reasons, however, summary judgment is still inappropriate.

**b. Secondary Meaning**

Aesthetic functionality will not preclude a finding of non-functionality where the design also indicates source. *Esercizio,* 944 F.2d at 1247, *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992). In this regard, proof of secondary meaning is generally not required by the owner of a registered trademark, *Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 364 (6th Cir.1984), and trademark law would protect designs not significantly related to a product's utilitarian function which had achieved secondary meaning. *Esercizio,* 944 F.2d at 1247. For the reasons discussed below, this Court concludes that there is a triable issue of material fact as to whether Plaintiff's mark indicates to the purchasing pub-

lic that the German Sink Company is the source of sinks containing the "S"-shaped divider.

A mark receiving protection from the Lanham Act is either inherently distinctive or has acquired distinctiveness ("secondary meaning"). *Cf. Wal–Mart,* 529 U.S. at 210, 120 S.Ct. 1339. "[A] mark is inherently distinctive if its intrinsic nature serves to identify a particular source." [5] *Id.* (internal quotations and brackets omitted). A mark has acquired distinctiveness "if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.* (internal quotations and brackets omitted).

Plaintiff has attempted to salvage her trademark by claiming that it also indicates the source of the product and has achieved secondary meaning or acquired distinctiveness. Her discussion of secondary meaning may be misplaced because proof of secondary meaning is generally not required by the owner of a registered trademark. *Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 364 (6th Cir.1984). As stated earlier, a registered trademark enjoys the protection of the presumption of validity, which includes distinctiveness. *Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 364 (6th Cir.1984). Otherwise the PTO would not have allowed her to register the mark. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 772, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1118 (6th Cir.1996). Defendants have the burden of rebutting this presumption. *Two Pesos,* 505 U.S. at 772, 112 S.Ct. 2753.

Both parties agree that the sink containing the "S"-shaped design has been in existence since at least 1890. The parties also agree that the sink had not been sold in the United States for several decades before Plaintiff had replicas produced to sell beginning in 1993. Plaintiff has filed an affidavit claiming "[t]hat in the last several years, the sinks with the stylized S-shaped divider used by German Sink Company have become synonymous with the German Silver Sink Company." She has also attached an affidavit to the same effect signed by Julie Koch, a retailer who owns a company known as Elegant Additions, which is an authorized showroom for products from the German Silver Sink Company.

While it is unclear whether the alleged secondary meaning attached prior to Plaintiff registering her trademark in 1997 or sometime thereafter, it should be noted that Plaintiff's Complaint states that the "S"-shaped divider was not intended to serve as a company logo. *See* Complaint at ¶ 22. Instead, it was simply for a "stylized design of a divider used to divide a sink into separate compartments." *Id.* This allegation indicates that Plaintiff never intended the mark to "become synonymous with the German Silver Sink Company," as attested to in the affidavits. This fact, however, does not require the conclusion that Plaintiff's mark was not or did not, in fact, become synonymous with its source, and Defendants have not produced any evidence to counter this presumption.

**5.** Although Defendants could have, they did not attempt to invalidate Plaintiff's trademark via an intervention in the trademark registration process. As Plaintiff argues, and Defendants do not contest, "[t]he United States Patent and trademark Office conducted a thorough review and investigation prior to ultimately granting registration for the Plaintiff's trademark for a stylized S-shaped divider to be used to divide the bowls of sink." Pl.s' Br. at 4. This Court affords the appropriate deference to the PTO's determination in this regard.

Defendants assert that Plaintiff's self-serving attestations and the affidavit of Julie Koch are insufficient to establish secondary meaning. As to Affiant Koch specifically, Defendants contend that, as a retailer, she does not represent the "purchasing public." Defendants have not identified any case law supporting their first argument. Defendants' second argument fails because confusion to retailers can be considered when determining secondary meaning. *See, e.g., Kentucky Fried Chicken Corp. v. Old Kentucky Home Fried Chicken, Inc.,* 313 F.Supp. 1096, 1099 (W.D.Ky.1970). Defendants cite *Inwood Lab. v. Ives Lab.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), *Wal–Mart,* 529 U.S. 214, and *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 843 (9th Cir.1987) for support of their position that the opinion of a single individual about how sinks with the distinctive S-shaped divider are perceived (i.e., conclusion that the sink was produced by German Silver Sink Company) does not address the perception of the "purchasing public." However, these cases are not to the contrary, as none of them explicitly state that retailers are not included in the "purchasing public."

As a registered mark, the "S"-shaped divider is entitled to a presumption of validity, which includes distinctiveness (either inherent or acquired). *Induct–O–Matic Corp.,* 747 F.2d at 364; *see also Two Pesos,* 505 U.S. at 772, 112 S.Ct. 2753 ("Since § 2 requires secondary meaning only as a condition to registering descriptive marks, there are plainly marks that are capable of being registered without showing secondary meaning."). "The fact that the U.S. Patent & Trademark Office registered [the 'S'-shaped divider] on the principal register demonstrates its judgment that the mark was not merely descriptive," as "a mark that is 'merely descriptive' may only be registered on the secondary register, and then only upon a showing of secondary meaning." *Champions Golf Club,* 78 F.3d at 1118 (citing 15 U.S.C. § 1052(e)). This Court concludes that Defendants have not effectively rebutted this presumption.

■ The intentional copying of trade dress raises a presumption of secondary meaning which may be rebutted only by showing an alternative logical reason for copying. *Esercizio,* 944 F.2d at 1239; *McNeil–PPC, Inc. v. Guardian Drug Co., Inc.,* 984 F.Supp. 1066, 1069 (E.D.Mich. 1997). Defendant has offered no "logical reason" for copying Plaintiff's trademark. Aesthetic functionality will not preclude a finding of non-functionality where the design also indicates source. *See Esercizio,* 944 F.2d at 1247.

Many of the cases Defendants cite for support acknowledge the concept of secondary meaning. *See Damn I'm Good,* 514 F.Supp. at 1360 ("stating that the doctrine of aesthetic functionality has no applicability in situations where a potential buyer is motivated by the aesthetic features of the design rather than the source of the product"); *see also Meadowcraft, Inc. v. B.I. Indus., Inc.,* 226 U.S.P.Q. 244 (N.D.Ala.1985) (stating that the dogwood floral design at issue constituted an aesthetic benefit to consumers rather than indicator of source); *Deere & Co. v. Farmhand, Inc.,* 560 F.Supp. 85 (S.D.Iowa 1982) ("Some designs adopted for the purpose of identification are not wholly useless, but perform some utilitarian function. Still, it deserves protection where the shape or feature is in its concept arbitrary."). Defendants have not persuaded the Court that Plaintiff's "S"-shaped divider sink design is not identified by the "purchasing public" with its "source" (i.e., German Silver Sink Company). Accordingly, this Court concludes that the use of Plaintiff's mark is protected. *See id.* (stating that "trademark law would protect designs not

significantly related to a product's utilitarian function which had achieved secondary meaning.").[6]

### c. Likelihood of Confusion

■ In the Sixth Circuit, eight factors must be considered when determining if there is a likelihood of confusion between trademarks: (1) the strength of plaintiff's mark; (2) the relatedness of the products or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care and sophistication; (7) the intent of the defendant in selecting its mark; and (8) the likelihood of expansion of the product lines using the mark. *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1106 (6th Cir.1991); *Therma–Scan, Inc. v. Thermoscan, Inc.*, 118 F.Supp.2d 792, 797 (E.D.Mich.2000). While the determination of whether there is a likelihood of confusion is a mixed question of fact and law, the "determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Homeowners*, 931 F.2d at 1107.

There is no mathematical formula for weighing the evidence. A plaintiff need not prove all, or even most, of the above factors to recover for trademark infringement. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988). The analysis is intended to yield an answer to the ultimate question of "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group*, 931 F.2d at 1107.

Although Defendants maintain that Plaintiff has not shown a likelihood of confusion, Defs.' Reply at 5, an analysis of the eight factors reveals that there is a great likelihood of confusion. As Plaintiff notes, "marketing for sale sinks using the stylized S-shaped divider for which the Plaintiff has obtained a trademark protection obviously creates 'product confusion.'" Pl.'s Br. at 9. The marks are irrefutably similar. Both parties sell sinks, making

---

**6.** In the context of word marks, courts classify according to one of five categories, in order of increasing protection accorded: (1) generic; (2) descriptive; (3) suggestive; (4) fanciful; and (5) arbitrary. *Wal–Mart*, 529 U.S. at 210, 120 S.Ct. 1339. A generic mark is generally a common description of goods and is ineligible for trademark protection. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use "imagination, thought, and perception to reach a conclusion as to the nature of the goods ..." Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and "with ease of establishing infringement." *W.W.W. Pharmaceutical Co. Inc., v. Gillette Co.*, 984 F.2d 567, 572 (2nd Cir.1993) (citations omitted).

Generic marks receive no protection because they are not capable of being registered as trademarks. *Two Pesos, Inc., v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Marks classified as "descriptive" are not considered inherently distinctive and will not receive the protection of the Lanham Act unless the mark's holder proves that the mark has acquired a "secondary meaning" in the marketplace thereby making it distinctive. *Id.; see also,* 1 J. McCarthy, *McCarthy of Trademarks and Unfair Competition,* §§ 11.05[1] (3rd ed. 1993) The suggestive, fanciful, and arbitrary marks are considered inherently distinctive and therefore worthy of protection. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753.

If, however, Plaintiff is attempting to argue in the alternative that her mark deserves protection under § 43, she has failed to do so. In such a case, Plaintiff has the burden of showing that her mark has acquired secondary meaning. *See, Wal–Mart,* 529 U.S. at 210, 216, 120 S.Ct. 1339. Her self-serving attestations and inadequate affidavits, *see, e.g.,* Pl.'s Br. at 8 (referring to Exhibits 6 and 8, Affidavits of Plaintiff and Retailer Julie Koch), are insufficient to so establish.

the relatedness of the products or services high. Moreover, the intent of the Defendants in selecting the mark, as evidenced by their conduct, was to "shut Maggie down and take her mark." *See* Pl.'s Br. at Ex. 4. This Court concludes that "relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way," thereby creating a likelihood of confusion.

### 2. Unfair Competition under § 43 of the Lanham Act

Plaintiff has also brought a claim for unfair competition presumably under § 43 of the Lanham Act. As noted earlier, § 43 provides that

[a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...

. . . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

As likelihood of confusion is the essence of an unfair competition claim, the same factors are considered under section 1125(a) as are considered under section 1114. *See Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1264 (6th Cir.1985) (listing the same factors in an action brought under §§ 1125(a)); *see also Wynn Oil Co. v. American Way Serv.*

*Corp.,* 943 F.2d 595, 604 (6th Cir.1991). Defendants concede this fact in their brief. *See* Defs.' Br. at 17. Because this Court finds a triable issue of fact as to trademark infringement, it also holds that a genuine issue of material fact exists as to Plaintiff's claim of unfair competition under section 1125(a).

### C. State Law Claims

Plaintiff's Complaint alleges common-law claims of unfair competition (Count II) and breach of fiduciary duty (Count III). Each will be addressed in turn.

### 1. Unfair Competition

■ Defendants argue that Michigan common-law recognizes unfair competition only in cases of fraud, bad faith, misrepresentation, misappropriation or product confusion. *See* Defs.' Br. at 17–18. However, the applicable standard under Michigan common law is the same as the tests for federal trademark infringement and federal unfair competition under 15 U.S.C. §§ 1114(1) and 1125(a): whether confusion is likely. *See Homeowners Group, Inc.,* 931 F.2d at 1105 n. 1; *Microsoft Corp. v. Compusource Distributors, Inc.,* 115 F.Supp.2d 800 (E.D.Mich.2000).

■ Even if unfair competition is limited only to cases of fraud, bad faith, misrepresentation, misappropriation or product confusion, Plaintiff has presented a triable issue of fact as to this cause of action. As Plaintiff notes:

The Defendants have . . . misappropriated the trademark design for the stylized sink divider. The Defendants have further made numerous fraudulent or bad-faith misrepresentations of fact, including contacting Plaintiff's showrooms and distribution sources directly and advising them that Plaintiff's trademark is only for a "company logo" and nothing else, along with other falsities.

Pl.'s Br. at 9. "[T]he Defendant has written numerous misleading correspondence and advertisements wherein he has informed the public and customers and distributors of the Plaintiff that the Plaintiff's trademark only covers a 'company logo,'" and has "even [gone] so far as to contact the distributor of the Plaintiffs, Elegant Additions, in writing and advised them that he was going to ultimately put the Plaintiff out of business and 'take her mark.'" *Id.* These allegations are sufficient for Plaintiff to survive summary judgment.

Defendants cite *Lamb Knit–Goods Co. v. Lamb Glove & Mitten Co.*, 120 Mich. 159, 162–63, 78 N.W. 1072 (1899) (sic) for the proposition that "Michigan law does not prohibit the utilization of a product which has had common use." Defs.' Br. at 18. This case, which actually involved parties named *Lamb* Knit–Goods Company and *Lamb* Glove & Mitten Company, is inapposite. As the *Lamb Knit–Goods* court expressly stated, "[t]he case narrow[ed] down to the single question whether the defendant infringed the rights of complainant by the use of a corporate name so similar to that of complainant as to mislead the public, and, if so, what remedy ought to be applied." *Id.* at 163. Lamb Knit–Goods is factually and legally distinct from the case at bar as it did not involve an alleged infringement of a trademark in the same way as the instant case. Accordingly, this Court denies Defendants' motion as to Plaintiff's claim of unfair competition under Michigan common law.

## 2. Breach of Fiduciary Duty

 Count III of Plaintiff's Complaint alleges that Defendants breached their fiduciary duties. A "fiduciary relationship" arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another. *First Public Corp. v. Parfet*, 246 Mich.App. 182, 191, 631 N.W.2d 785 (2001). Such relationships may be found to exist either by virtue of an express confidentiality non-use/non-disclosure agreement or, in appropriate circumstances, may be implied by law. *Aerospace America, Inc. v. Abatement Tech., Inc.*, 738 F.Supp. 1061, 1071 (E.D.Mich.1990).

Plaintiff asserts that "the Defendants were in a position of confidentiality and trust vis-a-vis the Plaintiff." Specifically, Plaintiff claims that "in making confidential, proprietary business information available to the Defendants (for purposes of performing fabrication work for the Plaintiff), the Plaintiff reposed a great amount of trust and fidelity in the Defendants." Plaintiff does not allege, however, that she communicated to the Defendants, either orally or in writing, that the information she shared was confidential. If a fiduciary relationship is to be found, therefore, it must be of the type of relationship which creates a "confidential" or "fiduciary" duty by operation of law. *Id.*

Plaintiff argues that because she "reposed faith, confidence and trust in the Defendants when the Defendants were hired to perform the fabrication of the original sink made by the Plaintiff with the stylized S-shaped divider," there is at least a factual question as to whether Defendants had a fiduciary duty to the Plaintiff. *See* Pl.'s Br. at 10. This argument is insufficient to survive Defendants' Motion for Summary Judgment as to this claim. As this court noted in *Aerospace America*, "the underlying basis of a confidential relationship is the preclusion of any nonmutual profit arising from the dealings of the parties." *Id.* at 1071. The relationship at issue here fails this test because of the independent and autonomous posture of the parties in correlation with each other in this matter.

Additionally, as the *Aerospace America* court further noted, "Michigan courts have been loathe to imply a 'confidential' rela-

tionship ... simply by virtue of the contract or agency relationship of the parties and instead, require that there be an explicit, at least verbal, warning that the information disclosed is confidential and/or not to be disclosed or used without authorization." *Id.* Although speaking in the context of trade secret misappropriation, the court's observation is instructive where, as here, the parties are two independent for-profit entities with no relationship aside from the one contractually created. *See, Id.* Plaintiff's failure to establish the existence of a fiduciary relationship entitles Defendants to summary judgment on this claim.

## IV. CONCLUSION

A feature of non-patented goods is functional if it impacts upon their objective, action, or operation, or the convenience or economy of processing, handling or using them. Where a mark is registered, however, it is afforded the presumption of operation and aesthetic non-functionality. While Defendants have not successfully rebutted the presumption of the operational non-functionality, they have done so with regard to aesthetic non-functionality. Nonetheless, this Court denies Defendants' Motion for Summary Judgment as to the trademark infringement claim because, although Defendants have shown that the "S"-shaped divider is aesthetically functional, they have failed to show that it has not attained secondary meaning.

Federal and state law claims of unfair competition rise and fall with a showing of likelihood of confusion. A finding that summary judgment is inappropriate as to the trademark infringement case necessitates the same conclusion as to Plaintiff's claims of unfair competition. Therefore, this Court also denies Defendants' Motion for Summary Judgment on Plaintiff's unfair competition claims under both federal and state law.

However, this Court grants Defendants' Motion for Summary Judgment with regard to Plaintiff's claim of breach of fiduciary duty. A "fiduciary relationship" arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another. Plaintiff has failed to adduce evidence of a special relationship giving rise to fiduciary duties owed Plaintiff by Defendant. Summary judgment, therefore, is appropriate.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (**Docket # 11, filed October 22, 2001**) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment as to Counts I and II are **DENIED**, but is **GRANTED** as to Count III.

**IT IS FURTHER ORDERED** that a Final Pretrial Conference is scheduled for Tuesday, November 12, 2002, 3:30 p.m. All parties with authority to settle must appear. A Joint Final Pretrial Order pursuant to Local Rule 16.1 must be submitted to Chambers by November 5, 2002.